The Honorable, the Judges of the United States Courts of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Courts of Appeals for the Fourth Circuit, are admonished to draw an eye and give their attention. The Court is now sitting. God save the United States and the Honorable Court. Please be seated. Before we hear from counsel in our first case, I would like to express our thanks as a court for the gracious hospitality that has been extended to us by Wake Forest. We have been honored and are very pleased to be here, and perhaps it will not be nine years before you invite us back again. We are now ready for argument in our first case, McKinney v. G4S. Mr. Grimes. Thank you, Your Honor, and I'd like to add to that welcome. It's a privilege and an honor to be here at Wake Forest with you. I recall the last time I had the privilege of arguing in a law school. It was back at Washington and Lee several years ago when my now partner, Brittany Haddix, was a law student there. And it went so well that I hired her, and she's working for me now. So it's a pleasure to be here. Lest there be any doubt, after Charlottesville, racial animus is alive and well in rural southwest Virginia. But the overarching error of the district court in this case is that it viewed the evidence in the light most favorable to G4S, and not McKinney, in violation of the clear mandate of Tolan v. Cotton, the Supreme Court opinion, and our own Rule 56 case law. G4S properly conceded below that the evidence was sufficient to establish a hostile environment claim, including the fourth element of the hostile environment claim. So the first question for this court is whether the court erred by concluding that G4S was entitled to the Farragher-Elderth affirmative defense as a matter of law with respect to the hostile environment claim. We submit that it is not. I may as well address the elephant in the room. The district court overlooked a critical fact in this case, and that is that the noose in question, all 16 feet 4 inches of it, was not just purchased at Walmart in May of 2013. It had been in that workplace for at least 4 years. If you look at Judge Dillon's opinion, she says in footnote 4, it is not clear how long the noose had been there. That's not true. If you look at G4S's own report, which is in the record as our summary of Judgment Exhibit 5 at page 892, G4S's own records say the noose that was found recently also surfaced in 2009 and then it disappeared. It is racial, no doubt about it. When she says it isn't clear how long the noose was there, that could be either good or bad for your client, right? Could have been longer, could have been a shorter period of time? I think it's good for my client and bad for G4S, Judge Diaz, because G4S used the word surface. That noose surfaced in 2009 and we knew about it. It is racial, no doubt about it. When you say we knew about it, your client knew about it as of 2009? If I said we knew about it, G4S knew about it. G4S knew about it in 2009. Okay, when did your client know about it? When did the appellant know about it? There's no evidence that my client knew about it until the day it was presented to him in May of whatever the day was, 2013. Part of the question is why do you think that helps you if your client was unaware of it until the incident that's described? And you seem to view it as a very critical piece of evidence and I'm trying to understand why. It is a critical or at least an important piece of evidence and when you ask why that is important, it is for this reason. Because it means that G4S doesn't get the affirmative defense. Because under the first prong, it is required to use reasonable steps to prevent harassment or discrimination and to take adequate steps to remedy it. And look, prevention of racial harassment 101 requires, or so a jury may find, that nooses be removed from the workplace once they're found. And therefore, when G4S first found that noose, I use the word first and that may not be right, when it surfaced in 2009, it had an obligation then to remove it. Who found it? Who found it? You say, I mean, if G4S found it, but is it clear that management found the noose? No, it's not clear that management found the noose. What's clear is that G4S knew that it surfaced in 2009. After the fact or before the fact? After, what do you mean after the fact? Well, I mean, you're talking in both past tense and present tense. I'm trying to figure out who knew what when. You say G4S knew about the noose in 2009. Who in G4S knew about the noose? I can't tell you what specific person or even what... Then how could it possibly be the company's responsibility? Because under the company's own policy, when there's evidence of racial harassment... That's exactly right. Okay, and that's true. But in accordance with their policy, remember this is a military or quasi-military organization. Let me, I'll answer your specific question, then I want to give you an overlay. When something like that is found in the workplace, it's just like you go through the airport. If you see... You're not answering my question. Who found the noose and why is the company liable for that or should be liable for it? The jury may find... Who found the noose? I can't tell you the name of the person or the title. But when someone finds something like that in accordance with their policy, they're required to report it up the chain of command. Report it up. But if they do not, then the knowledge can't be imputed to the employer. Do you have other... Are there other matters you would like to bring to your attention? Yes. Let me tell you what concerns me about this case and perhaps that would be helpful for you. Yes. We see a fair number of employment cases. And from the perspective of someone who has seen a lot of them, it almost seems as though it could be argued that these facts are a model for employers. The company reacted immediately after it learned of the incident. The president or the highest ranking African American in the company gave Mr. McKinney his personal... His cell phone number so that he could contact him at any time as he did. He visited and talked with Mr. McKinney every time he was on the plant. Immediate steps were taken to investigate what happened, meeting with 30 employees. The responsible employee, the supervisor was terminated before the end of that investigation. And Mr. McKinney has acknowledged that he was not thereafter harassed on the basis of race. So, it seems as though in the scheme of things, the employer acted very promptly and very comprehensively. So, what more? There was a noose. I'm not sure it matters. I'm not convinced yet that it matters to your argument when it surfaced. But we know that it did surface. After it surfaced and the employer knew about it, did the employer not react promptly and comprehensively? And we submit that is a jury question because of white versus BFI way services. Why on the facts? Are the facts that I stated correct? Sort of. Okay, and what facts that I put out there do you take issue with? There has to be more than just you're saying that's not quite correct. There is a burden that shifts to the party resisting summary judgment to come forward with something more than a bare assertion. Correct? Yes. Yes. So, let me tell you now. Thank you. So, when Mr. McKinney discovered the noose, when we have the noose in the Ku Klux Klan hood incident, he reported it to Colonel Penland, who is the highest ranking officer at the Radford Arsenal. Understand the way the Radford Arsenal works. First of all, it's a 7,000-acre munition facility on the banks of the New River in Radford. It's federal property run by the Army. BAE is the subcontractor that manufactures the dynamite for the Navy and the other branches of service. G4S, it provides a security for the place. So, there is a military chain of command there. That's what I'm trying to tell you. And when McKinney reported it, he went to the highest person there, knowing full well that that would get back to G4S, which it did. And within days, G4S wasn't going to do anything. But then here's what happened, Judge Duncan. Here's the answer to your question. Within days, Walker Southers, the head of BAE at the facility, told G4S that McKinney's going to file a charge of discrimination with the EEOC. Well, no, some things happened before the EEOC, I believe. Didn't Mr. Allen visit the facility? Mr. Allen sent Mr. Handel. No, Mr. Allen talked with Mr. McKinney before. Mr. Allen is the one who initiated the investigation. Is that correct? Mr. Allen is the one who initiated the investigation from Florida. Yes. So, he had initiated the investigation, which had not culminated, because it appears to have been a fairly comprehensive investigation. I don't know what was comprehensive about it. Well, he talked to 30 people. He talked to a lot of people. He came to the Burger King. He tried to get the news from McKinney. McKinney gave him photographs, which he then lost the photographs. And then you're right. And this is what I give you, what I give G4S. Then they terminated one of the four, a gang of four, and that was Sean Lewis. But they did nothing to J.C. Allison, the security chief, Greg Gravely, the fleet manager and janitorial supervisor, and Ryan Gunn. Mr. Lewis was the supervisor, was he not? He was the project manager at G4S. He was on the same level with those other people I'm telling you about. Except that, at least as I understood it, Mr. and please do correct me if I'm wrong. Yes. Mr. McKinney did report to Mr. Lewis. He did. So, at least with respect to Mr. McKinney, Mr. Lewis was in his direct chain of command. Correct, correct. And there was a dispute of fact with respect to all the other employees. They vehemently denied Mr. McKinney's account of what occurred. But the person who was his supervisor was terminated. Right. He was terminated. We say that's fortuitous for G4S under the Seventh Circuit's opinion, which we cite on brief. Sheehan. Yes. But Sheehan is a little different, isn't it? It was the timing that was fortuitous in Sheehan, not liability itself. So, yes. And we give to you and give to G4S that it terminated Sean Lewis. And I guess the question may be, as you're asking, is that enough? No. Well, terminating the responsible supervisor, is that enough? You're arguing that's not enough. Not under White v. BFI Waste Services. What would be enough? To have removed the noose from the workplace back in 2009. What this court said in White v. BFI Waste Services, when a company neglects to enforce the policy. And there's evidence here there's a dysfunctional or ineffective policy. But you've acknowledged that we don't know that the company knew there was a noose in 2009. The inference is that they did. There is no inference that can be, there's no inference. You can't identify. How can we draw that inference? Because on page 892, Mr. Handel says the noose surfaced in 2009. He found that out during the investigation of Mr. McKinney's complaint. Don't know that. But Mr. Handel wasn't involved until then, is that correct? Don't know that. Mr. Handel was not called in by Mr. Allen to investigate? In 2013, yes. Yes. Yes. I thought you meant 2009. But if we don't know that, then whose burden is it to sort of connect the dots here? You've got a gap in the evidence. You say the noose was uncovered or was somewhere in the facility in 2009. But you haven't connected that to some knowledge on the part of someone in a position to do something about it. And of course, I see your point, Judge Diaz. I have your point. But our argument would be that there were other things going on there. And that's why I wanted not to focus completely on the noose. There's a Confederate flag on a smoking device displayed since the 1980s. And Walker Southers from BAE, I think this is an important point, sends Sean Lewis down there and says, Go find the Confederate items that are there. He tells them that three times. Go find the Confederate items. Supposedly, that's how Sean Lewis found the noose to begin with. But when the Confederate flag on the whatever that incendiary device was was pointed out to management, it was promptly removed. But it was displayed on the wall. When managers have an obligation to, you go to the airport and it says, If you see something, say something. They have that same duty at G4S. If you see something that could be racially harassing like a noose or a Confederate flag, then you have to report it so they can at least look into it. Do I have an email? And when it was reported, they did look into it. The Confederate flag? All of this. The Confederate flag sat on the walls for 20 years. A Confederate monument in Raleigh, does the fact that it's there mean that somebody has a duty to remove it? It's just the presence of the Confederate flag, which may well be offensive. Does that impose an affirmative duty on the part of the employer? I guess if you have a Confederate flag, which a jury could find, means you're not welcome here. Mr. Grimes, I thought part of your theory of this case is that the employer here was sort of dragged, kicking and screaming into doing something about this incident. And simply by dumb luck, the fact that the superior insisted on Mr. Lewis being fired, that that standing alone just isn't enough to show reasonable initiative on the part of the employer. Part of the plaintiff's argument is right. Walker Southers and Colonel Panlin put the pressure on the security force, G4S, to remove Sean Lewis. Was the investigation complete at that time? Diaz would be, that's fortuitous for G4S. I'm sorry, Judge. Was Handel's investigation complete at that time? At what time? At the time Sean Lewis was terminated? I would have to say yes. Was the investigation completed when they fired Sean Lewis? I would have to say yes. It's not ongoing. I don't think. And the record may not speak directly to that, but I would have to say yes. And the answer may be no. And it may be that it was ongoing and that the pressure came from above, from the contractor, from the Army, get rid of Sean Lewis. Because that's what happened here. Sean Lewis, he's only been there since April, April of 2013. He made it a big 30 days at the Radford Arsenal before Colonel Panlin. He's been replaced, but he was the colonel at the time. And Walker Southers ordered that he be removed from the facility. So there's like an integrated workforce. And by that I mean they all work together. They work for separate companies, but they work together, if you will. They report to each other. They report ultimately to Colonel Panlin, even though he's not an employer. I'm sorry, Judge Duncan. Yes? No, it's just that your red light has been on for some time. My word. And it comes sometimes as an unpleasant surprise. As it has to me. Well, but you have reserved time. You do have time. You have reserved time, which will remain intact on rebuttal. I have two more legal theories. I rest on brief on those. I don't want to concede those by virtue of the fact that I didn't get to them. You will come back on rebuttal. Very well. Thank you. Thank you. Good morning, Your Honors. Good morning. My name is Edward Phillips from the Tennessee Bar. It is an honor indeed to be here. I drove around the university last night. This is one of the most beautiful University of Tennessee law graduates. But I'm very envious not only of the law school, but the entire facility. I have my co-counsel here, Catherine McKenzie, who is senior counsel for the appellee G4S Government Solutions LLC, which I'll refer to as G4S. There's really two issues in this case. The Farragher-Ellerith defense. Did the district judge correctly find that we met all three elements of the Farragher-Ellerith defense? And did the district judge correctly find, I assume Mr. Grimes is going to argue the retaliation case, did the district court correctly find there was no materially adverse employment action? We say she did. Your Honor, to get to the... Could I ask? Yes, Your Honor. Is there a reason that the employer should get the benefit of the fortuity that the government contractor, I believe it was, said, fire Mr. Lewis? And I thought... Well, first off, Your Honor, excuse me for interrupting, the government contractor never said fire Mr. Lewis. I'm sorry, it was... The government contractor said remove Mr. Lewis, which was right in the middle of the investigation. I was going to ask about the timing of the investigation. If I might, Your Honor, if I could explain what G4S did do, I think it explains in spades why we met the responsibility to correct this harassment. Number one, as Your Honor has noted, Rich Allen discovered it on May 31, 2013, when he was told by a third party he immediately met with Captain McKinney. Rich Allen is one of the senior members of the management. He is himself an African-American. I thought that was in dispute, this meeting on May 31st. I don't know. I thought Captain McKinney said that he had no recollection of that meeting. I don't know, Your Honor. He met with Captain McKinney on May 31st. Well, he says that, but I thought the record was in dispute. I don't think that's right, Your Honor. All right. Well, let's forget about that for a moment. So let me ask you about this. So you say on May 31st he finds out about this, and his description to Marcia Aldrich, he knows that this is an incident involving a noose and a KKK hood covering of some sort. At least he knows generally what this is about. And in his email to Ms. Aldrich, he describes it as allegedly some comments including racial overtones. He's actually focusing more on the larger dysfunction of the organization and concerned about that. Then he says, fortunately, this commander is leaving soon enough, but not soon enough to avoid the visit, suggesting that but for the fact that this commander was still in place, this company would have had no interest, no interest at all in investigating this matter. Doesn't that set up an issue of fact for the jury to consider? No, Your Honor, I don't think so. And let me explain. The reason that he was writing Ms. Aldrich was also in the record, there was an email from Southers, the head BAE person, wanting the company to bring somebody up for a full-fledged investigation of all sorts of issues. That's why Mr. Handel interviewed 30 people. It wasn't just about Mr. McKinney. Mr. McKinney, Mr. Allen learned about Mr. McKinney's complaint on the 31st. He called Handel, this is in the record, undisputed, and said, I need you to come up and do this other deep dive into these other issues, and I need you to investigate this racial harassment issue. And Allen testified that he told Handel about what it was. So then Handel comes up on June the 4th, 5th, and 6th, interviews 30 people. He interviewed, the large bulk of those were firefighters, don't have anything to do with Mr. McKinney. He did interview Mr. McKinney. Mr. Handel gathered what happened. He apologized. He said, this should never have occurred. He said, we're going to do a detailed investigation. He recommended a detailed investigation, which was done. The next thing that happened, and this is the one thing that Mr. McKinney's counsel seems to ignore, the very next time Mr. Allen came back, and he met with not only Mr. McKinney, and he said, are things going fine? Mr. McKinney said, yes, they are. Are you being treated with dignity and respect? He said, yes. He then went to the alleged harassers, and he said, we're going to do a full investigation, and are you treating him, not are you, you will treat him with dignity and respect. I was going to say, I thought that was also in dispute, because Mr. Allison suggested that he had no recollection of that conversation with Mr. Allen regarding a directive from his superiors to treat Mr. McKinney with respect. Your Honor, you've got me on that one. I thought I knew this record pretty well, but I'm not really aware of that. It doesn't mean that you're not entitled to summary judgment, but I guess what it means is that there may be some questions here that, from your opposing counsel's point of view, suggest less than some alacrity in moving forward with some really serious allegations. Well, we... When did Mr... I also thought that it was not in dispute that Mr. Allen met with Mr. McKinney on the 31st, because I thought that was when he gave Mr. McKinney his cell phone number. You're exactly correct, Your Honor. On the 31st, he met with Mr. McKinney. And Mr. McKinney... He doesn't... Mr. McKinney doesn't dispute that he met with Mr. Allen. He may say, I don't know if it was the 31st, but he... I grant you that. He testified. And Mr. Allen said, this is wrong. It shouldn't happen. We'll take it very seriously. Here's my card. Please call me on my cell phone if you have any problems. Then they came and did this initial investigation, and Mr. Allen came back, and then in the middle of that, while Mr. Handel is coming back on the 19th, on the 17th, BAE contacts Mr. Allen and says, we want Lewis removed, but we want it to be done seamlessly. Suthers. Suthers. Excuse me, Suthers. You're right, Your Honor. Right. It was Suthers who oversaw the contract. It wasn't Mr. Allen. No, that's right. Suthers, I'm sorry, contacted Allen. And that was the basis of my initial question, and that is, GS4 is getting, is kind of getting credit for an action that was initiated by the person who oversaw the contract. Well, in a sense, that's correct, Your Honor, but that was removing, and that was before the investigation was complete, so Mr. Handel hadn't even finished the investigation. They did remove him, but when Mr. Handel finished the investigation, which was on the 22nd, Mr. Allen came back on the 28th and fired Mr. Lewis. And they argue that that was required by the Army. There's no testimony or evidence to that effect. It doesn't even meet common sense. Well, as I recall, Suthers said that Lewis was to be removed from the contract. That's exactly right. He wasn't necessarily to be fired. Or the words were not fired. It was removed from this contract. Exactly. It was due to the issues that had arisen, which led to the internal investigation. I believe the record is, Your Honor, that Suthers asked that he be removed from the contract immediately on the 20th of June because Mr. McKinney was filing an EEOC charge. And he was removed, but he didn't say terminate him. And they can't tell a subcontractor to terminate an employee. The company terminated him after the investigation. Although if there wasn't another contract, it might not be much of a difference. If that was a major contract, then removing him from the contract... Your Honor, they had transferred him in from another contract just two months earlier. They have contracts all over. So the fact is the harasser was terminated. What about the... Mr. McKinney did not feel that the diversity training programs to be followed by the supervisory staff were adequate. Your Honor, Mr. Handel directed that there be diversity training. There was diversity training for all of the people involved in this incident. Mr. Lewis was gone. And for the top manager, who was Mr. Anderson, who has replaced him. By the way, that's another corrective action I didn't get to. They hired Mr. Anderson on the 27th of July. Mr. McKinney testified he was a good manager. He was fair. He communicated directly with me. I got all my information I needed from him. That's a corrective action I think we should get credit for. Did I answer the court's question?  We're not shy about letting you know if you haven't answered our question. The argument that the company should have disciplined these other three individuals I think is foreclosed by the Xerces case. Essentially, in that case, two employees were guilty of calling an African-American boy. They were counseled. They apologized. The company conducted training. And the Xerces court said the fact that formal disciplinary action such as suspension or termination was not taken against the two harassers at that time is an insufficient basis for concluding that Xerces' response was unreasonable. Taking a punitive action against a harassing employee, i.e., reprimand, suspension, or dismissal, is not necessary to insulate the employee from liability for a hostile work environment so long as the remedy is reasonably calculated to prevent future instances of harassment. What about the Seventh Circuit case that Mr. Grimes referred to in Sheehan? We honor police. Respectfully, we're not in the Seventh Circuit. And the Fourth Circuit has held if you take corrective action and it stops the harassment in the Spicer case and in the Xerces case, then that should end the matter as a matter of law, which is exactly what we did. The harassment stopped on May 31 when the number two or three person in the company waited in. And they took all these steps and actions and it never came back. It's a two-pronged test, as I understand it, taking the corrective action but also having steps in place to prevent it in the first place. And this record suggests that at least with respect to that prong that there was a certain dysfunction in this organization that may have, I guess one could argue, reasonably prevent someone from coming forward to an employer because of the culture and environment. Let me address that, Your Honor. That comes out of the notes that Mr. Handel took of this investigation. There were a number of firefighters who came to Mr. Handel and said, our fire chief has threatened us. If we call Florida or use the hotline, we'll be terminated. There were several people who said that. Frankly, the individual, the statements are all cited in the plaintiff's brief as if they're admissible evidence. They're not. But in other words, the firefighter said that, the fire chief said, told that to Handel and he wrote it in this report. But even if you get aside from the hearsay, the district judge correctly held, number one, McKinney's not a firefighter. This is a huge complex. The company had three different departments, janitorial, fire, and guard. Fire chief was over the firefighters. Mr. McKinney never testified that he knew about that, had any knowledge of that, those statements, alleged statements by the fire chief. He didn't report to him. And the district court correctly held that nobody in his chain of command was arguably threatening people not to apply. So it doesn't, we say the district court was correct. That's not sufficient evidence to show that the company's harassment policy was dysfunctional. Well, when did, when did, I had a question about that. When did G4S become aware that, I think it's Altizer, is it, was attempting to undermine or acting in a way that did not seem to be consistent? When Mr. Handel reported. Okay. On June the 3rd. And one other point, Your Honor, this business of the rope having been there, the noose having been there, that is clearly a hearsay issue. Someone reports to Handel that this rope was here. It's in his employee comments document. The number has already been given. It's a four-page document where he's recording statements given to him by employees. And someone said, well, that noose surfaced in 2009 and it's here again. So we don't know who the declarant is. It's not an admissible fact for summary judgment purposes. And there's no evidence the company had any knowledge of it. So the elephant in the room is really based upon inadmissible hearsay in a company document from an unknown declarant. Could I go to the second prong very quickly? Because I'm going to run out of time, unless you have other questions. The second prong is, did Mr. McKinney unreasonably fail to report the harassment? And the district court was exactly correct. What happened, well, first off, under the Spicer case, excuse me, under the Mott v. Ocean Baldhead Island case, you don't look at the last incident of harassment. You look at the first incident of harassment. Mr. McKinney testified that this janitor used the N-word in 2011. He didn't complain. It's the same janitor who Mr. McKinney says made a racial comment with respect to the noose. Mr. McKinney says that Altizer, the fire chief, used the colored boy epithet in the fall of 2012, eight months before this. He didn't report that, but he did start tape recording managers, supervisors, and employees. He retained seven tape recordings between October 2011 and before the final event. But he didn't bother to, and he had testified this was for evidence for his lawsuit. So he didn't bother to tell the company that he was going to file a lawsuit or report the racial epithets, which were clearly not appropriate. And if you look at the Mott v. Ocean Baldhead Island case, the court said the only way we can assess whether Mott via failed to take advantage of any preventive or corrective opportunities provided by the employer is to examine Mott via's actions from the time the unwelcome conduct began. Mott via's pick-and-choose method would make a mockery of this inquiry and would violate basic tenets of fairness. So the problem with Mr. McKinney is he didn't report it for eight months. The Lisow case says any evidence that the plaintiff failed to utilize, the complaint procedure will normally suffice its burden under the second element. We believe we have met that. And finally, to the retaliation claim. Mr. McKinney, if you cut through all the hyperbole in his brief, there are two things that he says the company did to retaliate. Two written memos that were issued on May 24, corrective actions, and he has an affidavit in the record that says, I was left out of meetings in which vital information was conveyed and I had no knowledge of it and I was counseled, repeatedly counseled. And those are his two adverse, materially adverse employment actions. Now we're here under the Burlington Northern Standard. The question is, is that sufficient for Mr. McKinney to claim that a reasonable person would have been deterred from complaining because of those two complaining about harassment? I thought he also questioned his shift supervisor transition. Well, yes, Your Honor. Let me speak to that. I did have a question about that because I don't know that I saw it in the record. Could he have turned that down, the transfer from shift B to shift A? Oh, I don't know if that's the, I don't know, Your Honor. But it's, I don't know. I hadn't seen it in the record. It's not in the record. But what is crystal clear in the record is, I asked Mr. McKinney. He said it's a preferred shift. He said he preferred the shift. It's more prestigious. It covers more people. It's not an adverse action. It can't possibly be. And for the first time on the appeal, they said, well, he didn't get a raise. Well, captains don't get a raise based on the shift that they have. But he viewed it as a positive, not a negative. I understand. I was just interested in whether that was an option for him. I don't believe it's in the record one way or the other. The record does show, though, that he did get at least one or two raises. He did get a raise. And he never missed a day's work. Well, actually, he got two raises. He never missed a day's work. Well, one of those raises was before, Your Honor. Well, I thought both of them were. In February 2012, he got a 16% raise. And then in September 2012, he got a 3.8%. That's true, Your Honor. But he also got a raise after he raised the complaint. Subsequent. Where is it? I don't. Thank you. It's in the record. I wish I could tell you the page. That's fine. Thank you. But to the point of this materially adverse action relative to these two complaints, there are two problems with the written memos. The first one is Mr. McKinney testified at great length that those memos were retaliatory not for what he said the day before or having anything to do with the news or the KKK hood. They were in retaliation for a complaint he made to Colonel Penland before the final event about him working too many hours. And then, according to Mr. McKinney's testimony, Walker Southers, the BAE guy, called Lewis on the carpet and Mr. McKinney said Mr. Lewis retaliated against him by giving him these two written memos. That's not based upon a protected activity. But the last point, Your Honor, and I think I can cover this in 32 seconds. Neither one of those, either the written corrections or the being held out of meetings for which I was corrected under the Fourth Circuit, as I understand the case law, are materially adverse. There's the Parsons v. Winn case. Poor performance reviews are not materially adverse under Burlington Northern. Adams v. Ann Arundel County, Fourth Circuit. Reprimands of poor performance evaluations are much less likely to involve adverse employment actions. Here, the plaintiff has failed to link such matters to some material change in conditions of employment. There are five district court opinions. Hinton v. Virginia Union University, Wright v. Kent County. Mr. Phillips? Yes, Your Honor. Your red light is on. Oh, I'm sorry, Your Honor. Would you like to finish your sentence? I would, Your Honor. There are five district court decisions, Wright v. Kent County, Phillips v. City of Concord, Christie v. Myrtle Beach, all of which say that negative performance evaluations, reprimands, warnings, and counseling are alone insufficient to constitute materially adverse employment actions, and there's no evidence of any collateral impact on Mr. McKinney's job. Thank you for your patience. One second. Thank you. Thank you. Judge Diaz, I want to begin where you left off with the statement, fortunately this commander is leaving soon, but not soon enough to avoid this visit. Let me tell you what happened after that point in time. After that point in time, Handel met with McKinney, then lost the photograph of the noose, and then wrote up Mr. McKinney and said, quote, Mr. McKinney is very sensitive and can overreact to situations, close quote. After that time, McKinney was written up twice in one day, Ann Lewis wanted to write him up a third time, and then an employee wrote of Mr. McKinney, we need to, quote, get rid of his ass, close quote. The first and only black captain in the history of G4S at the Radford Arsenal. After that point in time, a white worker referred to a black worker using a word I won't even say, it's the N word, and referred to a white woman with black children, with biracial children, as a cakey-headed bitch. That speaks to a jury question concerning whether the policy... He was also promptly suspended and told if it happened again, he would be terminated. That's what they say every time it happens. Don't do it. Mr. Grimes, is my assumption correct that he was promptly suspended and told that if it happened again, it would be terminated? He was disciplined. And the only reason it goes on, Judge Duncan, a jury may find is the remedial actions are not adequate. Are you kidding me? In the face of a noose and a Ku Klux Klan hood, blacks are still referred to using the N word, and white women with biracial children are referred to as cakey-headed bitches. When McKinney says they made a signed paperwork saying there was diversity training, but there was none. There was none. So either this sort of thing continues at G4S or it does not. I didn't have time to get into TEA or retaliation. I think you should talk about retaliation, but I did notice that Mr. McKinney acknowledged that subsequent conduct directed toward him was he did not feel was on the basis, was not harassing on the basis of race. On the basis of complaining, correct. It's protected activity, complaining about racial harassment. Right, there is a difference and we acknowledge that. Okay, thank you. And now you might want to use your time on retaliation and you might want to start with addressing whether there was any material adverse employment actions. I will do that. I think a burning question in this case is does G4S get a pass because Sean Bush would have been fired anyway. Mr. Grimes, my question is, is there a material adverse employment action for retaliation purposes? We say there is. And that would be? And that would be that on the day after G4S learned that McKinney was going to the EOC, which is a protected activity, he was written up twice in one day. Do you have case law out of the Fourth Circuit saying that disciplinary action that does not result in a change in salary or status or benefits can be considered? Alone. The word alone is important. Alone. Alone. And what else? Did it affect salary, employment status? Did not affect salary. He's still a captain as far as we know. That much is true. There's no demotion. There's no termination. There's no suspension. And in fact, he was given the shift position that he wanted. A change in shift. Yeah, and he's still a captain. But he wanted to be on the day shift. Yeah, he said that's a better shift. That's correct. Okay, so just stay with me long enough to tell me, do you have a material adverse employment action under our precedent? We say the write-ups are material adverse employment action. I can see that alone, that is not sufficient under our precedent. And you say alone, and so what more is there? Being ostracized and left out of management meetings when you're a manager and need to be at those meetings to do your job. And we say, what we say, Judge Duncan, is collectively those matters are materially adverse employment actions for the purpose of the second element of a retaliation claim, the other elements not being in dispute. I have no time to address the tort claim. I'll stand on brief and answer any questions that the panel may have. But I took up most of your time, so let me just make sure. And do you want to conclude if you can encapsulate your argument or the remainder of your argument in about two sentences or so? Just to sum it up, we finally got a black captain at the Radford Arsenal, and you see what happened to him within months after his appointment in September of 2012. He's not wanted there. They want to get rid of his ass. They want to get rid of his ass today. Thank you very much. Thank you. We will step down in Greek Council and proceed directly to the next case. Thank you. Please rise.
judges: Allyson K. Duncan, Albert Diaz, Stephanie D. Thacker